No. 13-1031

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

**JOSEPH ANTONIO,** *et al.*,

*Plaintiffs-Appellants,*

*v.*

**SSA SECURITY, INC. d/b/a SECURITY SERVICES OF
AMERICA,** *et al.*,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
District of Maryland,
Judge Alexander Williams, Jr.

---

**APPELLANTS' CORRECTED OPENING BRIEF**

---

Isabelle M. Thabault
Megan Whyte
WASHINGTON LAWYERS COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, NW
Suite 400
Washington, D.C. 20036
(202) 319-1000 (telephone)
(202) 319-1010 (fax)

Ruthanne M. Deutsch
*Counsel of Record*
Steven H. Schulman
Joseph L. Decker
Maka Y. Hutson
AKIN GUMP STRAUSS HAUER &
FELD LLP
1333 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 887-4000 (telephone)
(202) 887-4288 (fax)
rmdeutsch@akingump.com

*Counsel for Plaintiffs-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1, Appellants Joseph Antonio, Bulan Jules-Antonio, Michael Clark, Carolyn Clark, Thomas Cooper, Angel Fountain-Cooper, Gregory Gibbs, Natalie Gibbs, George Haley, Yvonne Haley, Jacque Hightower, Dawn Tolson-Hightower, Khari Jackson, Belinda Jackson, Harold Jewett, Cynthia Jewett, Michael Johnson, Crystal Johnson, Jagath Kankanamage, Keth Kankanamage, Keith Robinson, Takeysha Robinson, Beverly Rowe, Everton Rowe, Erik Smith, Sharon Smith, Leonard Swoopes, Evora Swoopes, Kendall Walker and Samantha Walker hereby disclose that they are not publicly held corporations or other publicly held entities.  As such, they do not have parent corporations, nor does any public corporation or other publicly held entity own any related stock.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT .............................................................9

STATEMENT OF THE ISSUES ...............................................................9

STATEMENT OF THE CASE....................................................................10

STATEMENT OF THE FACTS.................................................................12

    **A.**    The Homebuyers' Connection To Hunters Brooke .............................12

    **B.**    SSA's Promises To Protect ............................................12

    **C.**    The Hiring And Training Of Speed And Fitzpatrick..........................14

    **D.**    The Arson ..................................................................17

    **E.**    The Maryland Security Guards Act....................................19

    **F.**    Proceedings Below ......................................................20

SUMMARY OF THE ARGUMENT ......................................................29

STANDARD OF REVIEW ....................................................................31

ARGUMENT ...........................................................................................31

**I.**    SECTION 19-501 NOWHERE LIMITS A LICENSED SECURITY GUARD AGENCY'S RESPONSIBILITY FOR EMPLOYEE ACTS TO THE NARROW RANGE OF CONDUCT COVERED BY TRADITIONAL VICARIOUS LIABILITY PRINCIPLES ........................31

    **A.**    Section 19-501 Means What It Says ...............................33

    **B.**    The Legislative History Confirms That Section 19-501 Holds A Security Guard Agency Responsible For Conduct Beyond Those Actions Within An Employee's Scope Of Employment ........40

    **C.**    Where As Here, Legislative Intent Is Manifest, Section 19-501 Supplements The Common Law .......................................48

**II.**    IF DOUBT REMAINS AS TO THE MEANING OF SECTION 19-501, THE QUESTION SHOULD BE CERTIFIED TO THE MARYLAND COURT OF APPEALS ........................................52

**III.**   THE HOMEBUYERS' NEGLIGENCE CLAIMS SHOULD HAVE
GONE TO TRIAL ........................................................................56

    **A.**   SSA Owed A Duty of Reasonable Care To Protect The
Homebuyers From Harm.................................................57

    **B.**   Foreseeability Was The Jury's To Decide ...........................66

CONCLUSION .....................................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).............................................................31

*Arundel Corp. v. Marie*,
860 A.2d 886 (Md. 2004)....................................................33

*Baltimore Sun Co. v. Mayor and City Council of Baltimore*,
755 A.2d 1130 (Md. 2000)..................................................50

*Bank of Am. v. Musselman*,
222 F. Supp. 2d 792 (E.D. Va. 2002).............................52, 53

*Board of Educ. of Balt. Cnty. v. Zimmer–Rubert*,
973 A.2d 233 (2009)...........................................................40

*Boblitz v. Boblitz*,
462 A.2d 506 (Md. 1983).....................................................55

*Chesapeake & O. Ry. Co. v. Coffey*,
37 F.2d 320 (4th Cir. 1930).................................................68

*Chow v. State*,
903 A.2d 388 (Md. 2006)................................................38, 39

*Collins v. State*,
861 A.2d 727 (Md. 2004).....................................................33

*County Council v. Dutcher*,
780 A.2d 1137 (Md. 2001)...................................................39

*Cox v. Prince George's Cnty.*,
460 A.2d 1038 (Md. 1983)...................................................37

*Cramer v. Housing Opps. Comm'n of Montgomery Cnty.*,
501 A.2d 35 (Md. 1985)..............................................*passim*

*Cruz v. Madison Detective Bureau, Inc.*,
137 A.D.2d 86 (N.Y. App. Div., 1988)................................63

*Davis v. Slater*,
   861 A.2d 78 (Md. 2004) ...............................................................49, 50

*Deville v. State*,
   858 A.2d 484 (Md. 2004) ....................................................................35

*Doe v. Pharmacia & Upjohn, Inc.*,
   No. 03-2166, 2005 WL 273143 (4th Cir. Feb. 4, 2005)....................55

*Drug Fair of Md., Inc. v. Smith*,
   283 A.2d 392 (Md. 1971) ....................................................................36

*East Coast Freight Lines, Inc. v. Mayor & City Council of Balt.*,
   58 A.2d 290 (Md. 1948) ......................................................................37

*Farley v. Yerman*,
   190 A.2d 773 (Md. 1963) ....................................................................66

*Federated Dep't Stores, Inc. v. Le*,
   595 A.2d 1067 (Md. 1991) ..................................................................38

*Fidelity First Home Mortg. Co. v. Williams*,
   56 A.3d 501 (Md. Ct. Spec. App. 2012 ...............................................38

*Foor v. Juvenile Servs. Admin.*,
   552 A.2d 947 (Md. Ct. Spec. App. 1989)......................................67, 68

*Gates v. Sprint Spectrum, L.P.*,
   523 F. Supp. 2d 1287 (D. Kan. 2007)..................................................64

*Genies v. State*,
   43 A.3d 1007 (Md. 2012) ....................................................................50

*Graves v. State*,
   772 A.2d 1225 (Md. 2001) ..................................................................43

*Hamilton v. Ford Motor Credit Company*,
   502 A.2D 1057 (Md. Ct. Spec. App., 1986).........................................64

*Hemmings v. Pelham Wood LLP*,
   826 A.2d 443 (Md. 2003) ....................................................................62

*Henley v. Prince George's Cnty.*,
　　503 A.2d 1333 (Md. 1986) ........................................................................*passim*

*Hoover Ball & Bearing Co., Inc.. v. Pinkerton's, Inc.*,
　　500 F. Supp. 673 (W.D. Mich. 1980) ..................................................48

*Hopkins Chem. Co. v. Read Drug & Chem. Co.*,
　　92 A. 478 (Md. 1914) ..............................................................36, 38

*Hudson v. Housing Auth. of Balt. City*,
　　935 A.2d 395 (Md. 2007) .................................................................43

*Jama v. Immigration & Customs Enforcement*,
　　543 U.S. 335 (2005)..................................................................39, 40

*Johnson v. Collins Entm't Co., Inc.*,
　　199 F.3d 710 (4th Cir. 1999) ..........................................................53

*Knouse Foods Coop., Inc. v. Burns Int'l Sec. Servs., Inc.*,
　　519 F. Supp. 867 (E.D. Pa. 1981)....................................................48

*Lehman Bros. v. Schein*,
　　416 U.S. 386 (1974)........................................................................54

*LePore v. Gulf Oil Corp.*,
　　207 A.2d 451 (Md. 1965) ..........................................................36, 37

*Lewis v. Accelerated Transport-Pony Express, Inc.*,
　　148 A.2d 783 (Md. 1959) ..........................................................36, 37

*Lutz v. State*,
　　172 A. 354 (1934)............................................................................48

*Mayer & Town Council of Oakland v. Mayer & Town Council of Mountain Lake Park,*
　　896 A.2d 1036 (Md. 2006) ..............................................................33

*Montgomery Cnty. v. Deibler*,
　　31 A.3d 191 (Md. 2011) ..................................................................35

*National Capital Naturists, Inc. v. Board of Supervisors of Accomack Cnty.*,
　　878 F.2d 128 (4th Cir. 1989) ..........................................................53

*Nickens v. Mount Vernon Realty Grp., LLC*,
    54 A.3d 742 (Md. 2012) ...................................................................50

*Powell v. United States Fid. & Guaranty Co.*,
    88 F.3d 271 (4th Cir. 1996) ..........................................................53

*Price v. State*,
    835 A.2d 1221 (Md. 2003) ............................................................39

*Rabon v. Guardsmark, Inc.*,
    571 F.2d 1277 (4th Cir. 1978) ................................................47, 48

*Sacks v. Pleasant*,
    251 A.2d 858 (Md. 1969) ..............................................................68

*Sawyer v. Humphries*,
    587 A.2d 467 (Md. 1991) ........................................................36, 49

*Scott v. Watson*,
    359 A.2d 548 (Md. 1976) ..............................................................62

*Shenker v. Laureate Educ., Inc.*,
    983 A.2d 408 (Md. 2009) ........................................................40, 41

*Simmons, Inc. v. Pinkerton's, Inc.*,
    762 F.2d 591 (7th Cir. 1985) ........................................................46

*State v. Bell*,
    720 A.2d 311 (Md. 1998) ..............................................................43

*Stewart Warner Corp. v. Burns Int'l Sec. Servs., Inc*,
    353 F. Supp. 1387 (N.D. Ill. 1973)...........................................46, 48

*Taylor v. Mandel*,
    935 A.2d 671 (Md. 2007) ..............................................................36

*United Pac. Ins. Co. v. East*,
    250 F.3d 234 (4th Cir. 2001) ........................................................54

*United States v. Carolina Transformer Co.*,
    *978 F.2d 832* (4th Cir. 1992) ........................................................31

*Walzer v. Osborne*,
  911 A.2d 427 (Md. 2006) ....................................................................48, 49, 50

*Welsh v. Gerber Prods. Inc.*,
  839 F.2d 1035 (4th Cir. 1988) ....................................................................54, 55

*Williams v. Cloverland Farms Dairy, Inc.*,
  78 F. Supp. 2d 479 (D. Md. 1999).....................................................................61

*Witte v. Azarian*,
  801 A.2d 160 (Md. 2002) ...........................................................................33, 49

*Wolfe v. Anne Arundel Cnty.*,
  761 A.2d 935 (Md. Ct. Spec. App. 2000).............................................................37

*Wood v. Abell*,
  300 A.2d 665 (Md. 1973) ................................................................................36

*Yonce v. Smithkline Beecham Clinical Labs., Inc.*,
  680 A.2d 569 (Md. Ct. Spec. Appl. 1996)......................................................66, 67

**STATUTES**

28 U.S.C.
  § 1291...............................................................................................................9
  § 1331...............................................................................................................9
  § 1367...............................................................................................................9

42 U.S.C.
  § 1982........................................................................................................21, 23
  § 1985(3)....................................................................................................21, 23

Fair Housing Act, 42 U.S.C.
  § 4601 et seq. ..................................................................................................21

Md. Code Ann., 1951 Article 56
  § 70 (1951)............................................................................................20, 42, 47

Md. Code Ann., 1957 Article 56
  § 81(a) (1979) .......................................................................................20, 42, 47

Maryland Fair Housing Law, Md. Code Ann., Article 49B (2003) ........................21

vii

Md. Code Ann., Bus. Occ. & Prof.
    § 19-101 *et seq.* (1996) ............................................................................... 19
    § 19-101(g) (1996) ...................................................................................... 34
    § 19-101(l) (1996) .................................................................................. 34,35

Maryland Private Detectives Act, Md. Code Ann., Bus. Occ. & Prof.
    § 13-601 (1986) ............................................................................. 19, 41, 42

Maryland Security Company Statute, Md. Code Ann., Bus. Occ. & Prof.
    § 19-501(1996) ..................................................................................... *passim*

Md. Code Ann., Cts. & Jud. Proc.
    § 5-803(b) (2007) ......................................................................................... 40
    § 12-601 *et seq* (1996). ............................................................................... 24
    § 12-603 (1996) ............................................................................. 27, 52, 53

Md. Code Ann., Educ.
    § 4-104(d)(1) (2013) .................................................................................... 40

## OTHER AUTHORITIES

American Heritage College Dictionary
    (Houghton Mifflin Company ed., 3d ed. (1993)) ............................................... 35

Ballentine's Law Dictionary (3d. ed. 1969) ...................................................... 35

17A Charles Alan Wright et al., Fed. Practice & Procedure (3d ed. 2012) ............. 54

Webster's Third New International Dictionary Unabridged
    (Philip Babcock Gove et al. eds., 3d. ed. (1961)) ............................................. 35

William Lloyd Prosser, Prosser and Keeton on the Law of Torts § 53
    (W. Page Keeton et al. eds., 5th ed. 1984)) ...................................................... 66

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. Final judgment was entered on December 28, 2012. JA057; JA177-186. Appeal was timely noticed on January 3, 2013, and an amended notice of appeal was filed on January 15, 2013. JA187-188; JA189-190. This Court's jurisdiction rests on 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

1.     Whether a Maryland statute that makes a licensed security guard agency "responsible for the acts of each of its employees while the employee is conducting the business of the agency" holds agencies responsible only for those employee acts that would otherwise give rise to liability under traditional vicarious liability principles;

2.     Whether, if there is doubt as to the meaning of the Maryland Security Guards Act, the proper course is to certify to the Maryland Court of Appeals the question yet to be addressed by the Maryland courts—whether the statute is co-terminous with traditional vicarious liability principles; and

3.     Whether appellants' common law negligence-based counts should have gone to trial, given that appellee, a licensed security guard agency, had a recognized duty to protect appellants from harm.

## STATEMENT OF THE CASE

This case arises out of one of the largest residential arsons in Maryland history. JA091. Plaintiffs/Appellants (the "Homebuyers") were purchasers of homes in Hunters Brooke, a new development in Charles County, Maryland, and were actively involved in the design and construction of their future residences. *Id.* They visited frequently, directing design and structural changes, and were a regular presence in the neighborhood, including in the evenings when the security guards employed by appellee Security Services of America, Inc. ("SSA"), the licensed security guard agency responsible for protecting the neighborhood, were on duty.

Appellants' homes were destroyed by an act of arson that, was the brainchild of Aaron Lee Speed, an SSA guard, and was carried out by Speed and four co-conspirators. Utilizing inside knowledge gained from Speed's employment and working with flammable liquids planted in and around the targeted homes while Speed was on the job, Speed and his cohorts carried out the arson early in the morning of December 6, 2004, and they did so with knowledge that William Fitzpatrick, another SSA security guard, had abandoned his post. JA091-092. Speed and the other perpetrators of the arson have all pleaded or been found guilty of federal criminal charges. JA091.

All but three of the thirty-two Homebuyers are African-American and all are members of, or were living with a member of, a racial minority group. In

November 2005, the Homebuyers brought a civil suit against SSA, its two affiliated corporate entities, ABM Industries, Inc. and Security Services of America, LLC, and the five perpetrators of the arson, including Speed. JA093. The complaint, as amended in December 2006, alleged that the individual defendants "conspired to burn, damage, and destroy" their homes, "with the intent to prevent African-American families from moving into the neighborhood." JA059-060 at ¶ 1. The Amended Complaint included counts for federal and state civil rights violations, various common law counts sounding in tort and contract, and a count for violation of the Maryland Business Occupations and Professions Code, Section 19-501 (the Maryland Security Guards Act). JA059-086; JA094.

The scope of this appeal is narrow. All of the individual defendants have been dismissed from the action, as have SSA's two corporate affiliates. *See* JA177-186; JA057. The two plaintiffs already living in the neighborhood at the time of the arson have settled with SSA. *Id.* This appeal is brought by the thirty remaining plaintiffs against SSA and challenges only the district court's: (i) grant of summary judgment to SSA on Count VII of the complaint, which alleges liability under § 19-501 of the Maryland Security Guards Act, JA142-143; (ii) failure to certify to the Maryland Court of Appeals the state law question of first impression regarding the proper interpretation of § 19-501, JA161-163; and (iii)

refusal to allow the jury to rule on the direct negligence counts against SSA (Counts V and VI), JA176.

## STATEMENT OF THE FACTS

### A.    The Homebuyers' Connection To Hunters Brooke

The Homebuyers had contracted to purchase property in Hunters Brooke, a newly developed neighborhood in Charles County, Maryland, JA091, and, before the arson occurred, were on the verge of moving into their "dream homes," JA402 at 81:04-06; JA405 at 186:06-14; JA407 at 75:01-04.  The Homebuyers were actively involved in designing their houses, and many of their homes were built to address specific needs.  *See, e.g.*, JA409 at 72:04-73:08 (Rowe chose Hunters Brooke for a particular model he could customize, he did not want a "cookie cutter home"); JA412 at 94:14-95:12 (Swoopes stayed in contract for her home after the arson because it was specially designed with ramps for her disabled father).  All made regular visits to Hunters Brooke to observe the progress of work on their homes.  *See, e.g.*, JA418 at 84:02-08 (visited almost every day); JA421 at 84:15-85:04 (every weekend); JA410 at 125:03-09 (same); JA423 at 114:14-18 (same).

### B.    SSA's Promises To Protect

SSA was hired to provide security services at Hunters Brooke starting on November 12, 2004.  JA091.  SSA assigned a single security guard to protect the

site from 6:00 p.m. until 5:00 a.m., who was responsible, *inter alia*, for "prevent[ing] unauthorized individuals from entering." JA091-092.

SSA's guards were expected to "protect the lives and property of the client and his/her employees," and their basic security functions included "Access Control, Client Property Control, and Fire Protection." JA944. The "identification of unauthorized personnel" was stressed, in SSA's training materials, as a "very important" function of its employees. JA426. Guards were expected to observe and investigate accidents and personal injuries, JA424, and to report "employee misconduct, and any other matters deemed serious in nature," *id.* SSA also made cardiopulmonary resuscitation (CPR) training available to its officers, recognizing that "[q]uite often the initial call for help in a medical emergency is to security," and that "[w]eekend and late night patrolling officers make an equally high amount of first discoveries of medical emergencies." JA433.

SSA promoted its services as needed to prevent intentional bad acts. "We exist," SSA stated, "because our society isn't entirely honest." JA938. And SSA recognized that, because of this societal danger, SSA, as the "keepers of that trust[,] must be beyond question." *Id.* Accordingly, SSA promised rigorous background checks and employee screening procedures and assured that, at a minimum, "[e]ducation levels and employment verifications are confirmed and all of the standard reference information is collected and verified." JA650. But, as

13

SSA's Director of Investigations revealed, "due to cost concerns," some 4,500 of the 4,800 employees hired by SSA during 2003 (the year Speed was hired) did not receive comprehensive background investigations, even though such screening was particularly important for perspective employees, like Speed, that were not yet licensed through the state.  JA955; JA934 at ¶ 6.

Once employees were hired, SSA promised "top notch training at every post," JA939, including specific training with respect to fire prevention, fire detection and fire reporting, JA424 (guards must prepare when confronted with "fire, theft *** and any other matters deemed serious in nature").  Topics covered in the manual that all SSA employees were supposed to receive upon hiring included "fire and safety procedures,"  "powers of arrest," and "search and seizure."  JA429.

## C.    The Hiring And Training Of Speed And Fitzpatrick

Neither Speed nor Fitzpatrick was hired or trained in accord with SSA's announced standards.[1]  Speed was first hired in November, 2003.  JA665-668. He

---

[1] No real training was provided to the guards at Hunters Brooke beyond a quick walk-through of the site during their first shift, JA465-466 at 120:2-122:22 (Messick was "trained" at Hunters Brooke one day and then "trained" Speed the next day). Neither Fitzpatrick nor Speed received

had no prior experience as a security guard and did not hold a state license. JA477-478 at 22:12-28:17 (describing his hiring). Although Speed's application plainly revealed that he had left two of his previous jobs for questionable reasons, supplied only the first name of a third reference, and did not indicate that he had graduated from high school. JA665-668, SSA conducted no follow-up check on his references. JA168 (Speed's file contained no verifications of prior employment, education or references and that "SSA had not suggested that it performed any."). A simple call to one of Speed's listed references, Faith Kern, JA666, would have revealed that Speed had recently been in an outpatient mental health clinic and had led a "troubled life as a youngster," information that Ms. Kern willingly disclosed to a reporter for the Washington Post in the immediate aftermath of the arson, JA395. Anne Lee, SSA's local branch manager of SSA, acknowledged that if she had checked Speed's references and been provided with this information, she would not have hired him. JA966 at 37:4-20; JA969 at 40:22-25.

---

SSA's Security Operations Manual, touted by SSA to be "the greatest source of information for a guard." JA474 at ¶ 10, JA487-489 at 74:10-82:24 (the first time Speed saw the manual was when his attorneys mailed him a copy to prepare for his deposition in jail).

Speed quit SSA without notice in August 2004, less than a year after he was initially hired, after being reprimanded by his supervisor for careless and aggressive conduct.   JA454 at 56:03-57:11; JA459-496 at 125:25-126:24.  Despite this incident, and despite his supervisor writing "not for rehire," on Speed's personnel file, Speed was rehired by SSA without preconditions or penalty around November 2004.  JA456 at 67:03-68:07.  Shortly thereafter, Speed was assigned to Hunters Brooke.

William Fitzpatrick, a nearly-illiterate 42-year-old man with only a sixth grade education, was hired by SSA in May 2004.  JA473-474 at ¶¶ 3, 9.  It was widely known within SSA that Fitzpatrick could barely read and write, yet he was hired despite industry standards requiring a high school education, JA548, and stationed at Hunters Brooke despite on-site job requirements that required him to fill out written incident reports.[2]  Despite its obligation to provide security at Hunters Brooke until 5 a.m., SSA routinely allowed Fitzpatrick to depart early, leaving the property unguarded.  JA459-460 at 77:17-78:14; JA474 at ¶ 13.

As SSA's own former Director of Investigations acknowledged:

---

[2] Fitzpatrick would "straight out tell you he couldn't read or write," JA494 at 118:07-119:04, and testified that he required help from other SSA employees filling out many of his forms, including incident reports, JA474 at ¶9.

It is not surprising that the incident (arson), like the one at Hunters Brooke, may be a consequence of bad hiring, training and supervision practices. When a site is left unguarded the potential of bad things happen[sic] increases dramatically. The arson at Hunters Brooke would appear to be one of those scenarios that a thorough pre-employment background investigation would have prevented.

JA935 at ¶ 11.

### D.    The Arson

In the early morning hours of December 6, 2004, five men "executed a conspiracy to burn homes, most of which were minority-owned." JA091. The events giving rise to the arson are undisputed:

[Prior to the arson,] Defendant Speed and the other Individual Defendants conspired to burn and damage the homes, and allegedly did so with racial animus against African American and other minority families who planned to move into the houses. While on duty, Speed created a map of the neighborhood and determined the race of each house owner. Then, on December 3, 2004, while on duty, Speed allowed his co-conspirators to deposit flammable liquids within and round the houses in Hunters Brooke.

JA092.[3]

------

[3] During his December 3, 2004, shift Speed left his Hunters Brooke post for several hours. JA459-460 at 77:22-78:10; JA463 at 113:3-9. This was when he and his co-conspirators engaged in their preparatory activities, stashing the fuel used in the fires two nights later. JA092.

The morning of the fires, William Fitzpatrick was the guard on duty for SSA. After having already received authorization from his supervisor to leave 30 minutes early, Fitzpatrick abandoned his post one full hour early, because he was feeling sick. JA474 at ¶ 14. Fitzpatrick attempted to notify his supervisor at SSA and secure a replacement before leaving earlier than planned. And although SSA advertised its practice of "maintaining vigilant contact with our officers because we care," JA664, Fitzpatrick was unable to reach anyone at SSA, so he "left the site prior to 4:00 a.m. without informing [his] supervisors prior to leaving." JA474 at ¶ 14. Fitzpatrick did talk on the phone with Speed (who was off duty that night), and told him that he would be leaving early. *Id.*; JA092.

After Fitzpatrick left his post, the arsonists, including Speed, entered the site, and using the accelerants that had been previously stored by Speed while he was on duty, lit the targeted houses on fire. JA092. Unimpeded by any guards, the co-conspirators stayed at the scene of the arson for thirty to forty-five minutes, and saw the homes begin to flame. *Id.* At 4:54 a.m., the Charles County 911 Emergency system received a call reporting the fire. *Id.* Ninety percent of the damaged homes were owned or under contract to African-American or other minorities, and evidence indicated that the arson was racially motivated. JA092-093.

Immediately after the arson, SSA managers attempted to cover up the acts of their employees that might subject SSA to liability.   JA475 at ¶¶ 17-18; JA468 at 138:9-139:22.   SSA managers met with Fitzpatrick before they would let him talk to the authorities, asking him to lie and tell the federal investigators that he had stayed at his post for his entire shift, until 5 a.m.   JA475 at ¶¶ 17-18.   A site supervisor was terminated by SSA because he refused to lie about the fact that SSA had failed to obtain the required license for Speed to operate as a security guard.  JA467-468 at 134:16-138:21.

### E.    The Maryland Security Guards Act

Section 19-501 of the Maryland Security Guards Act, H.B. 42, 1996 Md. Laws 602 (codified as amended at Md. Code Ann., Bus. Occ. & Prof. § 19-101 *et seq.* (1996)) provides, in its entirety:

> Agency responsible for acts of employees:  A licensed security guard agency is responsible for the acts of each of its employees while the employee is conducting the business of the agency.

§ 19-501.  No Maryland court has construed this language, although the provision was enacted in 1996 and retained language drawn directly from the predecessor provision in the Maryland Private Detectives Act, Md. Code Ann., Bus. Occ. & Prof. § 13-601 (1986)  (which at the time, included security guards as persons hired out by private detective agencies to provide protective services).  JA104; JA933.    In 1996, the Legislature "'separate[d] the current provisions of law

governing the certification of security guards and the regulation of security guard services from the Maryland Private Detectives Act.'" JA105-106 (quoting JA933).

Special liability rules applied to Maryland agencies providing security guard services well before 1986. The longstanding policy in Maryland, as expressed in earlier iterations of the statute, was that licensed providers of protective services, were "at all times *** accountable for the good conduct in the business of each and every person so employed *** The employer shall be responsible for the actions and conduct of all employees in connection with such employer's business." Md. Code Ann., 1957 Art. 56 § 81(a) (1979); *see also* Md. Code Ann., 1951 Art. 56 § 70 (1951) (identical language).

### F.    Proceedings Below

**1.**  Thirty-two Homebuyers filed suit in November 2005, and after initial discovery and the gathering of further information from the parallel criminal proceedings against the individual defendants, amended their complaint in December 2006. The Homebuyers alleged that the defendants "conspired to burn, damage, and destroy houses in Hunters Brooke, *** with the intent to prevent African-American families from moving into the neighborhood." JA059-060 at ¶ 1. Years of extensive and litigious discovery resulted in the collection of thousands of documents, scores of depositions of parties and witnesses, and the engagement of experts by both sides who prepared opinions on standards in the

security industry, and the nature and extent of the Homebuyers' injuries. Along the way, sanctions were entered against SSA for spoliation, due to SSA's failure to preserve evidence when it closed the branch office responsible for managing its operations at Hunters Brooke. ECF Nos. 410; 411; *see also* JA146-152.

At issue on appeal are the district court's rulings granting summary judgment to SSA and dismissing the Homebuyers' claims of violation of § 19-501 of the Maryland Business Occupations and Professions Code (Count VII), negligent hiring, supervision, and training (Count V), and negligence (Count VI).[4]

With respect to § 19-501, the Homebuyers alleged that SSA was liable for their injuries because Speed and Fitzpatrick, while "conducting the business of SSA" engaged in the tortious conduct that was a direct and proximate cause of the harm suffered by the Homebuyers. JA080 at ¶ 99. In particular, the Homebuyers alleged that "Defendant Speed was on duty and otherwise conducting the business of SSA when he, among other things, identified the houses at Hunters Brooke that

---

[4] The ten-count complaint included: civil rights claims against all defendants under the Fair Housing Act, 42 U.S.C. § 4601 et seq. (Count I); Maryland Fair Housing Law, Md. Ann. Code Art. 49B (Count II); 42 U.S.C. § 1982 (Count III); 42 U.S.C. § 1985(3) (Count IV), a breach of contract claim against SSA (Count VIII); a tortuous interference with contract claim against all defendants (Count IX); and an intentional infliction of emotional distress claim against all defendants (Count X). JA059-086.

were to be occupied by African-American families, drew or obtained maps of the site for use in the conspiracy, and concealed or otherwise stored flammable liquids and other materials used to set fires at Plaintiffs' houses. Fitzpatrick was on duty and conducting the business of SSA when he abandoned his post and duties, allowing access by the Individual Defendants to Hunters Brooke and enabling them to set fire to Plaintiffs' homes." *Id.*

In seeking damages for negligent hiring, supervision, and training, the Homebuyers alleged they suffered injury and damages as a result of "SSA's failure to properly hire, train, and/or supervise its security guards [and provision of] access and opportunity to Defendant Speed and Fitzpatrick, both of whom were responsible, either directly or indirectly, for the fires that destroyed or damaged Plaintiffs' homes. Among other things, Defendant Speed used his position as a security guard to learn the race of the residents and buyers at Hunters Brooke, familiarize himself with the layout and vulnerabilities of the Hunters Brooke neighborhood, advise the other Individual Defendants how to access the neighborhood, provide a map of the neighborhood to use when setting the fires, and stash flammable materials at the site in advance. Further, Fitzpatrick voluntarily abandoned his post at Hunters Brooke, thereby allowing the Individual defendant's unfettered access to the neighborhood permitting them to set several fires." JA077 at ¶ 88. Count VI alleged that the series of fires and resulting

damages to plaintiffs were caused by SSA's own negligence, as well as the negligence of SSA's employees acting within the scope of their employment. JA078 at ¶ 93.

**2.**   On March 31, 2010, the district court disposed of much of the case on summary judgment.  JA090-141; JA142-143.[5]

Ruling on the cross-motions for summary judgment on SSA's liability under the Maryland Security Guards Act, the court characterized the parties' disagreement about "the novel issue of the proper construction of this statute," as "hing[ing] on the question of whether the statute codifies common law vicarious liability principles or holds security guard companies strictly liable for the acts of their on-duty employees."  JA103.

The district court acknowledged that "[n]o Maryland court has construed this statute," even though it was enacted in 1996, adopting language dating from 1986.  JA104.  The court also suggested *sua sponte* that it might be "appropriate

---

[5]  In rulings not here at issue, the district court granted summary judgment to the other corporate defendants.    JA142-143. The court also granted summary judgment to SSA on the Fair Housing Act claim (Count I); the claims for violations of 42 U.S.C. §§ 1982 and 1985(3) (Counts III and IV); the tortious interference with contract claim (Count IX), the intentional infliction of emotional distress claim (Count X), and the breach of contract claim (Count VIII).  *Id.*

for the Court to consider a motion to certify the question to the Maryland Court of Appeals, consistent with Md. Code Ann., Cts. & Jud. Proc. § 12-601 *et seq.*" JA110, n. 5. Yet the court then construed the statute to merely codify the common law, concluding that the statute held "employer security guard agencies liable for any acts of employees that are consistent with common law principles of vicarious liability." JA104.

In so holding, the district court rejected the Homebuyers' text-based argument that gave force to the inclusion of the word "while" in the statute, which, they argued, covered a broader range of on-duty conduct, or acts occurring at the same time as the employee was "conducting the business of the agency." JA105. Instead, the court adopted SSA's position that "liability under the statute is clearly equivalent to traditional theories of *respondeat superior* or 'conduct within the scope of employment or conduct taken on the agency's behalf.'" JA105 (quoting ECF No. 368 at 16), even though the statute did not speak in such limited terms.

In considering the legislative history, the court declined to accord any weight to the Maryland Legislature's rejection of a proposed amendment to substitute the narrower phrase "if the acts are within the scope of employment,"— the precise interpretation proposed by SSA—for the ultimately adopted, and broader, formulation, "while the employee is conducting the business of the agency." JA106-107. In disregarding this salient legislative history, the district

court mischaracterized this proposed language change as a "lobbyists' letter[] of informal proposed changes by non-legislators," *id.*, even though the amendment was in fact presented on the floor and rejected by the Senate. *See* JA782. Accordingly, the court declined to give "the weight typically reserved for rejection of formal legislative amendments," to what it mischaracterized as merely "a silent rejection of a lobbyist's suggestions." JA107.

The court's statutory analysis also relied heavily on the Maryland rule of construction that statutes should not be construed to abrogate the common law, concluding without elaboration that the statute "can plausibly be read to mirror the common law, not to clearly conflict with it." JA107-108. Finally, the court recognized the divide in cases from other jurisdictions interpreting similar statutes, and selectively distinguished those cases where courts had found security agencies liable for the intentional torts of their employees. JA108-109.

Despite the "compelling arguments" by both sides, JA104, and despite "appreciat[ing] the rationale for the interpretation Plaintiffs offer[ed]—[that] a security company is best positioned to examine the background of employees and exclude any who display a propensity to commit tortious acts," JA110—the court concluded that for SSA to be liable for the misconduct of its employees, the tortious acts in question must have occurred "within the scope of employment," or have been ratified by SSA, *id.*

The court then determined that, as a matter of law, all of Speed's "alleged on-duty preparations for the arson fell outside the scope of his employment as a security guard," because his "motives in preparing for this arson were undisputedly purely personal, and were in direct contravention of his formal duties to protect Hunters Brooke," JA111-112, and rejected the "aided by agency" and ratification theories of liability, JA116-119. But, "because it is typically a jury question whether an employee's action is within the scope of employment," and because the Homebuyers had presented evidence from which the jury could conclude that Fitzpatrick's early departure from his post fell within the scope of his employment, the court ruled that summary judgment was improper with respect to SSA's liability under § 19-501 for Fitzpatrick's alleged negligence. JA116; *see also* JA097.

The court likewise denied summary judgment on the Homebuyers' claims for negligence in hiring, training, and supervision and for negligence (Counts V and VI), "because issues of material fact" remained pending completion of the further discovery ordered after the Magistrate Judge's ruling on sanctions levied against SSA and its affiliated corporations. JA100-101. The court reasoned that "Corporate Defendants should not be allowed to benefit from their spoliation of evidence by asserting there are not disputed issues of material facts for negligence

claims when Plaintiffs have not received a fair opportunity for discovery on those claims." JA100.

The court concluded that the Homebuyers had presented enough evidence of severe emotional distress resulting from the arson to survive summary judgment on their claim of intentional infliction of emotional distress, in denying a motion for summary judgment filed by two of Speed's co-conspirators. JA133. This evidence, supported by expert testimony, showed the Homebuyers' "potentially severe injury." JA134. As the court later observed, the Homebuyers "continue to be haunted by the arson and have suffered emotional injuries with physical manifestations, such as insomnia, anxiety disorder, and major depressive disorder." JA167.

**3.** In July 2010, the court reconsidered its initial summary judgment ruling, finding sufficient evidence to allow claims regarding SSA's ratification of Fitzpatrick's negligence to proceed. JA158. At the same time, the court considered and rejected the Homebuyers' motion to certify, pursuant to the Maryland Courts and Judicial Proceedings Article of the Maryland Code, § 12-603, the "state law question of first impression":

> Whether the Maryland Security Company Statute (Maryland Business Occupations and Professions Code § 19-501) imposes liability beyond common law principles of *respondeat superior* to make security companies responsible for all acts committed by their employees while on duty.

27

*Id.* Although reaffirming that "the construction of the Maryland Security Company Statute with respect to liability is a novel issue and *** interpretation of this statute could be determinative of an issue in this case," JA159, the court nonetheless denied the Homebuyers' motion, because certification "would cause further delay of the case," *id.*

**4.** When moving for summary judgment on the remaining counts, SSA did not dispute that the Homebuyers had presented sufficient evidence to go to the jury on whether SSA breached its standard of care. *See* JA168. Rather, SSA argued that the negligence based claims failed as a matter of law because the Homebuyers "experienced only emotional distress and economic loss damages, which are insufficient to sustain a negligence claim under Maryland law." *Id.* The court agreed, granting summary judgment to SSA with respect to the thirty Plaintiffs who did not yet own property or live in Hunters Brooke at the time of the arson. JA173.

The district court reasoned that "although there is no question that Plaintiffs were emotionally invested in the properties, *** visiting the properties and participating in their design, their legal claims are founded on emotional harm flowing from economic damages rather than property damages." JA172-173. Even though the arson was the direct result of intentional acts, for which SSA's negligence could be deemed responsible, *see* JA170-171, the court declined to

"interpret[] the [Maryland law] exception allowing emotional harm damages for destruction of property to apply here, where SSA committed no fraud or malice," JA173. The court found that the exception would not apply where the Homebuyers were not yet the formal owners of the destroyed property. *Id.* The court also decided that a jury would not be allowed to determine the issue of foreseeability, instead determining as a matter of law that "it would not be foreseeable to SSA that its negligent acts would expose it to liability for the emotional harm of Plaintiffs who were neither in the zone of danger at the time of the arson nor suffered property damages as the result of the arson." I*d.*

## SUMMARY OF THE ARGUMENT

The district court's refusal to hold SSA responsible for the on-duty acts of Speed and Fitzpatrick cannot be squared with the plain meaning of the employer liability provision of the Maryland Security Guards Act and defies Maryland's stated public policy of allowing maximum recovery for tort victims. Section 19-501 nowhere purports to absolve SSA from the harm caused by its own negligence. On the contrary, it plainly holds SSA, a licensed security guard agency, fully responsible for the acts of its employees while "conducting the business of the agency;" language which by its terms encompasses far more than "conduct within the scope of employment or conduct taken on the agency's behalf." JA105.

All interpretative tools point to this result. In concluding the opposite, the district court engrafted an additional limitation onto the statute's otherwise plain text, misread the common law backdrop, ignored important legislative history, and misapplied fundamental principles of statutory construction. It defies common sense to conclude that Maryland would grant a licensed security guard agency like SSA a position of privilege and public trust, yet immunize it from liability for breaching that trust. Licensed security guard agencies like SSA provide their employees with unique opportunities to harm those they purport to protect, and are therefore best positioned to prevent exactly the type of harm that occurred. (*Part I*)

If doubt remains as to the meaning of the employer liability provision of the Maryland Security Guards Act, then the construction of § 19-501 should be certified to the Maryland Court of Appeals. This Court has regularly availed itself of Maryland's generous certification procedures, even when the district court has already decided the question. Certification is warranted here, where the Maryland courts have yet to address an outcome-dispositive legal question. (*Part II*)

Finally, the jury should be allowed to consider the Homebuyers' negligence-based claims. In dismissing the Homebuyers' claims, the district court paid no heed to Maryland precedent establishing SSA's duty to protect the Homebuyers from harm. This duty was particularly clear with respect to Speed's intentional torts, as SSA knew or should have known—given Speed's past history and erratic

and aggressive behavior while on the job—that he had a propensity to harm others. In improperly conflating duty with proximate cause, the district court wrongly usurped the jury's role in ruling on foreseeability, a question of fact. (*Part III*)

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo, and this Court applies the same standard of review required by a trial court. *United States v. Carolina Transformer Co., 978 F.2d 832, 835* (4th Cir. 1992). "On summary judgment, [this Court] must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Id.*, (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## ARGUMENT

## I. SECTION 19-501 NOWHERE LIMITS A LICENSED SECURITY GUARD AGENCY'S RESPONSIBILITY FOR EMPLOYEE ACTS TO THE NARROW RANGE OF CONDUCT COVERED BY TRADITIONAL VICARIOUS LIABILITY PRINCIPLES

The text, context, and history of § 19-501 all demonstrate that, in declaring a "licensed security guard agency is responsible for the acts of each of its employees while the employee is conducting the business of the agency," the Maryland Legislature intended to hold such licensed agencies accountable for a far broader range of conduct than the narrow subset of on-the-job activities that Maryland courts, applying *respondeat superior* principles, have held employers responsible for under the common law.

31

The Legislature's intent is textually apparent. The statute unambiguously holds security guard agencies responsible for the acts of their employees "while *** conducting the business of the agency." Section 19-501 is most readily construed to mean what it says: security guard agencies are responsible for those employee acts that take place *while* the employee is conducting the business of the agency, whether or not such acts further the employer's purpose. The district court's contrary holding not only excises the word "while" from the statute, it also aggressively rewrites the statute to engraft a purpose or intent limitation on covered employee conduct, although no such requirement is apparent on the face of the statutory text.

"[C]onducting the business of the agency" is not synonymous to the legal term of art "within the scope of employment," and the General Assembly has elsewhere demonstrated its willingness to use the precise term it omitted from § 19-501. The legislative history, too, provides further support for reading the phrase "while *** conducting the business of the agency," to mean something other than "within the scope of employment." The Maryland Legislature *rejected* a proposed amendment that was put forth to circumscribe the expected liability of security guard agencies under the statute by substituting the phrase "within the scope of employment" for the broader phrase that was ultimately adopted. This

history confirms the ordinary meaning; § 19-501 is best interpreted to extend liability beyond traditional vicarious liability principles.

In short, all interpretative tools point in the same direction: § 19-501 should be construed in accord with its plain meaning to hold security guard agencies responsible for the conduct of their employees while they are on the job, even when such conduct does not further the purpose of the agency. Under this construction, SSA should be held liable under § 19-501 for Speed's preparatory acts, the resulting arson and the foreseeable injuries to the Homebuyers, given the Homebuyers' evidence that Speed's tortious acts—identification and targeting of the Homebuyers and facilitation of the arson that was intended to keep them from the neighborhood—were carried out "while on duty." JA092.

## A.    Section 19-501 Means What It Says

The "paramount objective," of Maryland courts when construing statutes, "is to ascertain and effectuate the intent of the Legislature." *Mayer & Town Council of Oakland v. Mayer & Town Council of Mountain Lake Park,* 896 A.2d 1036, 1045 (Md. 2006); *Collins v. State*, 861 A.2d 727, 730 (Md. 2004). "'[T]he Legislature is presumed to have meant what it said and said what it meant.'" *Arundel Corp. v. Marie*, 860 A.2d 886, 894 (Md. 2004) (quoting *Witte v. Azarian*, 801 A.2d 160, 165 (Md. 2002)).

In concluding that SSA's statutory "responsibil[ity] for the acts of each of its employees while the employee is conducting the business of the agency," § 19-501, merely restates SSA's liability "under traditional vicarious liability principles," JA110, the district court defied these basic principles of construction, and adopted an interpretation of the statute that cannot be squared with its plain meaning.

**1.** The language of the statute evinces the Legislature's intent to hold a licensed security guard agency responsible for the acts—without qualification or exception—that are committed by each of its employees, "while," or during the time that the employee was performing the agency's business, i.e., providing security services:

> Agency responsible for acts of employees: A licensed security guard agency is responsible for the acts of each of its employees while the employee is conducting the business of the agency.

§ 19-501.

As defined by the Legislature, "conducting the business of the agency," means to provide services protecting persons or property. *See* Md. Code Ann., Bus. Occ. & Prof. § 19-101(g) ("licensed security guard agency" defined as "a person who is licensed by the Secretary to *conduct a business* that provides security guard services" (emphasis added)), § 19-101(l) ("Security guard services"

defined to encompass "any activity that is performed for compensation as a security guard to protect any person or property").

The term "while" is not defined. In construing words not explicitly defined in a statute, a court looks to ordinary, popular understandings of the English language, *Deville v. State,* 858 A.2d 484, 487 (Md. 2004), with dictionary definitions providing a "useful starting point," *Montgomery Cnty. v. Deibler,* 31 A.3d 191, 198 (Md. 2011). As universally defined, the ordinary meaning of the term "while"—when used as a conjunctive as in § 19-501—is "as long as" or "during the time that." American Heritage College Dictionary 1536-1537 (Houghton Mifflin Company ed., 3d ed. (1993)), *accord* Webster's Third New International Dictionary Unabridged 2604 (Philip Babcock Gove et al. eds., 3d. ed. (1961)) ("during the time that"), *accord* Ballentine's Law Dictionary 1368 (3d. ed. 1969) ("during a relevant period of time"); *see also* American Heritage College Dictionary at 1537 (also defining "while" as "at the same time that," or "although").

On its face, therefore, § 19-501 holds security guard agencies responsible for the acts of their employees that occur contemporaneously, or "while," the employee is conducting the business of the agency." It is thus best read to hold a licensed security guard agency responsible not only for an employee's acts in "conducting the business of the agency"—as understood in the common law

35

doctrine of *respondeat superior*—but also for those additional acts that take place "at the same time that" the employee is doing so, *e.g.*, for Speed's preparatory acts that he carried out "while on duty."  JA092.

**2.**   When analyzing a statute, Maryland courts "presume that the Legislature has acted with full knowledge of prior and existing law, legislation, and policy." *Taylor v. Mandel*, 935 A.2d 671, 684 (Md. 2007).  The Legislature that enacted § 19-501 should therefore be presumed to be aware of the vicarious liability standards, set forth in countless Maryland cases, and not to have wasted its legislative efforts to restate a settled common law principle.

In an "often-quoted passage," the Maryland Court of Appeals, in *Hopkins Chem. Co. v. Read Drug & Chem. Co.,* 92 A. 478, 479-480 (Md. 1914), explained that the "simple test" under common law for determining an employer's liability for an employee's acts is if the acts were:

> Within the scope of his employment; not whether they were done *while prosecuting the master's business, but whether they were done by the servant in furtherance thereof*, and were such as may fairly be said to have been authorized by him. (quoting from Wood on Master and Servant § 279 (1877)).

*Id.,* as *quoted in Sawyer v. Humphries*, 587 A.2d 467, 470-471 (Md. 1991) (emphasis added) (collecting cases, including, *e.g.*, *Wood v. Abell*, 300 A.2d 665, 671–672 (Md. 1973); *Drug Fair of Md., Inc. v. Smith*, 283 A.2d 392, 397 (Md. 1971); *LePore v. Gulf Oil Corp.*, 207 A.2d 451, 453 (Md. 1965); *Lewis v.*

*Accelerated Transport-Pony Express, Inc.*, 148 A.2d 783, 785 (Md. 1959); *East Coast Freight Lines, Inc. v. Mayor & City Council of Balt.*, 58 A.2d 290, 303–304 (Md. 1948)).

In other words, vicarious liability under common law does not cover mere conduct "while prosecuting the master's business," but extends to an employee's on-duty acts only with the added qualification that the employee's conduct itself furthers the interest of the employer. *See Wolfe v. Anne Arundel Cnty.*, 761 A.2d 935, 941 (Md. Ct. Spec. App. 2000) (on-duty policeman performed traffic stop; assault and rape of motorist not furthering interests of county therefore outside scope of his employment); *Cox v. Prince George's Cnty.*, 460 A.2d 1038, 1042 (Md. 1983) (actions of canine unit in encouraging dog to attack defendant would be allowed to proceed to let jury decide if officers' malicious conduct was outside scope of employment); *LePore,* 207 A.2d at 453 (collection agent who assaulted man while collecting money did not act for his employer's benefit therefore assault was outside scope of employment); *Lewis,* 148 A.2d at 785 (county's liability for appointed safety supervisor properly sent to jury to determine if supervisor's slander of a driver at a truck stop furthered the county's interests).

Under the common law, acts "within the scope of employment," are decidedly *not* identical to acts "while prosecuting [or conducting] the business of the employer."  Countless Maryland cases reiterate this bedrock principle. *See*

*Fidelity First Home Mortg. Co. v. Williams,* 56 A.3d 501, 54 (Md. Ct. Spec. App. 2012) (same passage from *Hopkins Chem. Co.* referenced as "often-quoted passage" for employer liability issues) (emphasis added). The district court itself applied this common law limit when absolving SSA from liability for Speed's conduct, notwithstanding his on-duty actions that contributed directly to the Homebuyers' injuries, because his motives were "undisputedly purely personal and were in direct contravention of his formal duties to protect Hunters Brooke." JA112.

But the text of the Maryland Security Guards Act debated and adopted by the Legislature contains no such command to inquire into the motives of an employee's on-duty acts before holding a licensed security guard agency responsible. The *only* limit it imposes on a licensed security guard agency's responsibility for the acts of each of its employees is temporal—that such acts occur "while the employee is conducting the business of the agency." § 19-501. The district court thus rewrote the statute by engrafting the very common law limits on liability that the statute plainly omits. By "restrict[ing] the coverage of [§ 19-501] by inserting specific conditions not set forth by the Legislature," *Federated Dep't Stores, Inc. v. Le*, 595 A.2d 1067, 1074 (Md. 1991), and improperly "assum[ing] authority to read into [the statute] what the Legislature

apparently deliberately left out," *Chow v. State*, 903 A.2d 388, 395 (Md. 2006), the district court committed reversible error.

The statute contains no textual inkling (much less a revealed intent) that a security company's responsibility should be circumscribed to only those employee actions that are taken in furtherance of the company's own purposes, as required under traditional vicarious liability principles. By reading the statute to impose common law limitations nowhere reflected in the statute's text, the district court violated the basic canon of construction that "[a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application." *Price v. State,* 835 A.2d 1221, 1226 (Md. 2003); *County Council v. Dutcher,* 780 A.2d 1137, 1147 (Md. 2001).

Nor can such choice be explained by any purported preference to avoid a legal term of art, as elsewhere in the Maryland code, the Legislature has demonstrated itself well able to use the term "scope of employment" to limit liability for the action of employees.[6] *Cf. Jama v. Immigration & Customs*

---

[6] The legislature employs the words "scope of employment" in conformance with common law vicarious liability in other sections of the Maryland Code. *See,*

*Enforcement*, 543 U.S. 335, 341 (2005) (Courts should "not lightly assume that [a Legislature] has omitted from its adopted text requirements that it nonetheless intends to apply," and this "reluctance is even greater when [the Legislature] has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

### B.    The Legislative History Confirms That Section 19-501 Holds A Security Guard Agency Responsible For Conduct Beyond Those Actions Within An Employee's Scope Of Employment

The district court's error is all the more glaring because the Legislature expressly *declined* to limit liability to the narrower common law term of art "scope of employment."   In other words, the Maryland Legislature has considered and rejected the district court's interpretation.

Maryland courts turn to legislative history to ensure that a court's "plain language interpretation is correct," *Board of Educ. of Balt. Cnty. v. Zimmer–Rubert*, 973 A.2d 233, 242 (2009) and "for the sake of testing the validity of [a]

---

*e.g.*, Md. Code Ann., Educ. § 4-104(d)(1) (2013) (noting that in claims brought against employees or agents of the school board "the board shall provide for counsel for that individual if: (i) The action was taken in the performance of his duties, *within the scope of his employment*, and without malice; and (ii) The board determines that he was acting within his authorized official capacity in the incident.") (emphasis added), *see also* Md. Code Ann., Cts. & Jud. Proc. § 5-803(b) (2007) (similar formulation for local government employees).

construction," *Shenker v. Laureate Educ., Inc*., 983 A.2d 408, 426 (Md. 2009). Here, legislative history reveals the Legislature's manifest intent to hold licensed security guard agencies responsible for the conduct of their on-duty employees without imposing common law limits.

**1.**  The district court correctly turned to the legislative history of the 1986 Private Detectives Act for guidance, because that statute is the precursor statute to the 1996 Security Guards Act. *See* JA104.  The language now contained in § 19-501 was drawn directly from the Maryland Private Detectives Act, § 13-601, which at the time, included security guards as persons hired out by private detective agencies to provide protective services, JA104 (citing JA933).  In 1996, the Legislature "'separate[d] the provisions of the law governing the certification of security guards and the regulation of security guard services from the Maryland Private Detectives Act.'"  JA105-106 (quoting JA933).

Prior to 1986, Maryland regulated detective agencies (which at that time also included agencies that provided security services) through a single section of the Maryland Code that regulated various professions (*e.g*., sales, real estate brokers, employment agencies).  Even under those earlier licensing schemes, however, the Legislature had adopted special rules for employees of private detective agencies and specific language describing the employer's liability for the employee's actions:

> The holder of any license issued under the provisions of this subtitle may employ to assist him in his work and in the conduct of his business as many persons as he may deem necessary, and he shall at all times during such employment be accountable for the good conduct in the business of each and every person so employed... The employer shall be responsible for the actions and conduct of all employees in connection with such employer's business.

1957 Art. 56 § 81(a); *see also identical language* 1951 Art. 56 § 70.

In March 1986, the Legislature considered revisions that eventually resulted in the passage of the Private Detectives Act. These proposed revisions were presented as a freestanding bill, Senate Bill 968, separate from other contemplated general changes to the Occupations Code that were to be introduced in a later session, so as to "allow[] the General Assembly to consider the issues involved more clearly and carefully." JA686.

The legislative history makes clear that to the extent the proposed Private Detectives Act contained any substantive changes at all, such changes were "included for the limited purpose of clarifying existing law." JA706. With respect to the employer liability provision, the final version of the statute retained the language as originally proposed in the first presentation of the bill. The history gives no hint of any legislative intent to limit or circumscribe employer liability, or to change the substance of the prior legislation. On the contrary, the Bill Analysis describes the meaning of what is now § 19-501 with terms even broader than the statutory text. The language adopted, the Bill Analysis elaborates, is meant to

"clarify[] provisions of Article 56, Section 81(a)(1)" (reproduced above), and (with no limitation) "specifies that *the agency is responsible for the acts of its employees*." JA712 (emphasis added).

**2.** In considering Senate Bill 968 "clearly and carefully," JA686, the Legislature rejected a formal amendment to replace the expansive wording "while *** conducting the business of the agency," with the narrower common law term of art, "within the scope of employment." JA782.

Maryland authority instructs a reviewing court to ascertain legislative intent by examining amendments to the bill that the legislature rejects. *See State v. Bell*, 720 A.2d 311, 317 (Md. 1998) ("One form of legislative history useful in determining legislative intent is amendments proposed but later rejected by the Legislature"); *Graves v. State*, 772 A.2d 1225, 1237 (Md. 2001) (comparing an initial version of a bill to its final form as support that the Legislature deliberately excluded out of state convictions from a criminal statute); *Hudson v. Housing Auth. of Balt. City*, 935 A.2d 395, 404 (Md. 2007) (basing construction of procedural rule on fact that proposed rule amendment was rejected). The district court concluded this authority was inapposite on the grounds that no amendment had been introduced. JA107. That was wrong.

On March 5, 1986, Loughlin Security Agency, representing the Maryland Association of Contract Guard Services, wrote to Senator Francis X. Kelly

suggesting that the Legislature substitute the words "if the acts are within the scope of employment," in place of the phrase "while the employee is conducting the business of the agency." JA698. The letter expressed concern that adopting the broader formulation proposed at the bill's first reading would provide "agency responsibility for any acts of an employee while the employee is actually on the job." *Id.* The proposed language change, the letter explained, "would certainly be interpreted by the Courts as providing liability consistent with common law principles. Under these principles, an employer is relieved of liability for acts of its employees when the employees are not performing services for which they have been engaged and when the employees are not acting in furtherance of the employer's interests." JA698-699.

The next week, Loughlin's Vice President, Russell E. Daniels, testified before the Senate Economic and Environmental Affairs Committee then considering the bill, reiterating the need to change the statute's wording so as to prevent "open-ended liability," on the part of licensed agencies. *See* JA695-697 (setting out substance of proposed changes and confirming appearance); JA718-721 (substance of testimony). With his testimony, a formal draft amendment was submitted, JA722-725. This proposed amendment is identical in form to that which was proposed on the floor by Senator Kelly, and the explanation provided for both is that the proposed change "clarifies that agencies are not responsible for

44

acts committed outside the scope of employment." *Compare* Loughlin's proposed amendment accompanying Daniels' testimony of March 12, 1986, JA722-725, *with* Senator Kelly's proposed amendment to Senate Bill No. 968, JA782. The General Assembly rejected Senator Kelly's amendment, maintaining the original formulation after the third and final reading of the Bill, in the version ultimately passed by the Senate and enacted. JA768-781.

The district court, however, gave no weight to this rejection of an amendment read on the floor, because it missed the entries in the legislative history establishing that the language was, although originally proposed by a private party, ultimately presented to the full Senate.[7] Rather, the district court mischaracterized the proposal as "lobbyists' letters or informal proposed changes by non-legislators" rather than what the court would have considered more weighty – "rejection of bills or amendments proposed by legislators." JA107.

---

[7] In their motion to certify, the Homebuyers pointed out this error to the district court, and again submitted that portion of the legislative history demonstrating that the proposal to substitute the narrower "within the scope of employment" language was considered as a formal amendment on the floor. *See* Reply to Pls. Mot. Certify Question of State Law, ECF No. 456, at 3, 3 n.1, and 12.

This was clear error. The Legislature rejected a formal amendment, and in doing so corroborated what is already apparent from the statutory text: in adopting the broad formulation "while *** conducting the business of the agency," the Legislature rejected common law limitations on liability. Simply put, the statute brooks no construction that would require an examination into the purpose or motive of an employee's acts before holding a licensed security guard agency responsible for the acts of its employees undertaken "while *** conducting the business of the agency."

**3.** The district court recognized the split of authority across jurisdictions interpreting similar statutes. *See* JA108-109. Yet the court was not persuaded by authority where courts had interpreted similar statutes to allow employer liability for security guards' intentional torts. *Id.* In distinguishing Maryland's statute, the court relied upon the absence of the term "good conduct" in § 19-501, as well as the disparate legislative history in other jurisdictions. *Id.*; *see also Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 595 (7th Cir. 1985); *Stewart Warner Corp. v. Burns Int'l Sec. Servs., Inc*, 353 F. Supp. 1387, 1389 (N.D. Ill. 1973).

But the existence of conflicting authority from other jurisdictions interpreting similar, but not-identical, statutes is a thin reed upon which to justify a rewrite of Maryland's statute in contravention of its plain meaning. Such conflict, moreover, provides an additional argument in favor of certification of the state law

question, *see, infra*, Part II.  What the district court failed to consider, too, is that the timing of the cases from other jurisdictions, when reviewed against the backdrop of the evolution of the Maryland statute, supports the Homebuyers' proposed construction.

As noted above, in enacting the predecessor to § 19-501, the Maryland General Assembly was not writing on a blank slate.  Rather, the legislature's stated purpose was to "clarify" the predecessor statute that contained the very "good conduct" language that the district court found lacking.  *See* JA712.  When viewed against the evolving law from other jurisdictions, both the pre-1986 use of "good conduct" language in the wording chosen to impose liability on private detective agencies for the acts of their employees, and the 1986 change to the current formulation, are fully consistent with legislative intent to hold licensed security guard agencies responsible for the acts of their employees even when such acts are not within the employees' scope of employment.

The 1951 Statute decreed the agency "shall at all times during such employment be accountable for the good conduct in the business of each and every person so employed."  The revisions which occurred in 1979 continued this same language.  *See* 1951 Art. 56 § 70, 1957 Art. 56 § 81(a).  At that time, the only decisions (from other jurisdictions) to have construed similar provisions had concluded that the "good conduct" wording imposed liability for acts committed

47

while an employee was on duty, even if the acts were not within the scope of employment. *See Stewart Warner*, 353 F. Supp. 1387; *Rabon v. Guardsmark, Inc.*, 571 F.2d 1277 (4th Cir. 1978).

By 1986, however, when the Private Detectives Act was introduced, and the language revised to its current form, other decisions had construed this "good conduct" language to impose a purpose requirement, thereby codifying the common law. *See Knouse Foods Coop., Inc. v. Burns Int'l Sec. Servs., Inc.*, 519 F. Supp. 867, 889 (E.D. Pa. 1981); *Hoover Ball & Bearing Co., Inc.. v. Pinkerton's, Inc.,* 500 F. Supp. 673, 675 (W.D. Mich. 1980). Against this backdrop, while clearly stating its intent to preserve and clarify the existing law, the legislature modified the statute's wording to an even broader formulation, omitting the "good conduct" language altogether.

### C. Where As Here, Legislative Intent Is Manifest, Section 19-501 Supplements The Common Law

**1.** In effectively rewriting the statute to impose the very common law constraints rejected by the Legislature, the district court leaned heavily on the principle that statutes are to be construed narrowly, so as to avoid making any change in the common law beyond what is expressly stated and necessary, JA107-108; *see also Lutz v. State*, 172 A. 354 (1934). But, as the Maryland Court of Appeals has observed, "'[m]ost statutes, of course, change the common law, so that principle [of narrow construction] necessarily bends when there is a clear

legislative intent to make a change.'" *Walzer v. Osborne*, 911 A.2d 427, 433 (Md. 2006) (quoting *Witte*, 801 A.2d at 169).

Here, the common law must bend. The General Assembly's manifest intent, as evinced by the text, context, and history of the statute, was to hold security guard agencies responsible for the conduct of their employees beyond the narrow confines recognized under Maryland common law *respondeat superior* principles. A plethora of Maryland cases, of which the Legislature is presumed to have been aware, established that an employee's acts "while prosecuting [or conducting] the business of the master," cover a broader range of conduct than that considered within the scope of employment. *See Sawyer*, 587 A.2d at 470-471 (collecting cases). In electing the broader formulation, the Legislature declined to limit liability to the narrow circumstances allowed under the common law rule (and rejected a formal amendment on the floor of the Senate precisely to this effect).

It would turn the canons of construction upside down to engraft the very common law limits that the General Assembly jettisoned, based on a wooden view that statutes can never modify the common law. It would also pose serious separation of power concerns to hold that "[t]he judicially created body of law known as the 'common law,'" is altogether "insulated from alteration… '[a]lthough the inhabitants of Maryland are entitled to the common law, that law is subject to modification by legislative acts ….'" *Davis v. Slater*, 861 A.2d 78, 86

49

(Md. 2004) (quoting *Baltimore Sun Co. v. Mayor and City Council of Baltimore*, 755 A.2d 1130, 1135 (Md. 2000)).

**2.**  Section 19-501 is best understood to supplement, rather than supplant, the common law—because  it expands the range of conduct for which licensed security guard agencies may be held liable but otherwise leaves the traditional common law remedy of vicarious liability untouched.  Accordingly, the canon against implied repeal of the common law has no bearing.  Thus, for example, the Maryland Court of Appeals concluded there was no abrogation of the common law crime of indecent exposure, deemed an offense against morality, when the Legislature created "a new offense and deterrent for inmates who indecently exposed themselves in an effort to abuse correctional officers."  *See Genies v. State*, 43 A.3d 1007, 1013 (Md. 2012).  The statute supplemented, rather than supplanted, the common law, because it was "intended to specifically criminalize harassment by inmates of correctional officers." *Id.* at 1012.  Similarly, statutory language allowing trial by jury as a matter of right for amounts in controversy over $10,000 did not repeal the common law right to trial by jury for lesser amounts, *see Davis,* 861 A.2d 78, and a Baltimore ordinance laying out a procedure for landlord repossession of property did not abrogate the common law right of self help that remained available, *see Nickens v. Mount Vernon Realty Grp., LLC*, 54 A.3d 742 (Md. 2012).  So too here, the original common law remedy against SSA for

vicarious liability remains unscathed, as do its limits and defenses, but the statutory option provides an additional means of relief against security guard agencies—"creating a new offence, and deterrent"—supplementing the traditional common law remedies.

3. The district court's forced construction should also be rejected as "unreasonable, illogical, [and] inconsistent with common sense." *See Walzer*, 911 A.2d at 432. It makes no sense to absolve licensed security guard agencies from responsibility for the acts of their employees while they are on the job—given that security guards have a special ability to injure others, due to their privileged access to protected areas. As the district court recognized, "a security company is best positioned to examine the background of employees and exclude any who display a propensity to commit tortious acts." JA110. *See also* JA546-547 ("SSA's security failures and breaches of the appropriate industry standards of care created the opportunity for the arson to occur). Interpreted in accord with its plain meaning, the statute serves to deter precisely the type of injury here alleged, which is the direct result of failing to train and supervise its guards and placing a person with a propensity to do harm in a position of trust that provides unique opportunities to injure others. Imposition of such added responsibility, beyond the limits of the normal confines of the common law, is a sensible obligation to impose

upon security guard agencies in exchange for the privilege of obtaining a state license.

To read § 19-501 as identical to the common law would not only contravene its plain meaning, it would render the entire provision a nullity. The Legislature exercised its prerogative, and power, to separately hold licensed security guard agencies fully responsible for the conduct of their on-duty employees, and the district court erred by failing to give full effect to this legislative intent.

## II.  IF DOUBT REMAINS AS TO THE MEANING OF SECTION 19-501, THE QUESTION SHOULD BE CERTIFIED TO THE MARYLAND COURT OF APPEALS

The district court recognized that no Maryland court, appellate or otherwise, has ruled on the "novel issue" of the proper meaning of § 19-501. JA103-104. "[I]nterpretation of this statute," therefore, "could be determinative of an issue in this case." JA159. These findings satisfy Maryland's certification criteria:

> The Court of Appeals of this State may answer a question of law certified to it by a court of the United States *** if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State.

Md. Code Ann., Cts. & Jud. Proc. § 12-603.

But when the Homebuyers moved to certify the proper construction of § 19-501, their motion was denied. JA159-160; JA161-163. This was error. Certification was called for because the meaning of § 19-501 was "(i) dispositive

and centrally important to the case; (ii) unlikely to be settled, rendered moot, or altered by factual development or litigation; and (iii) *** not uniformly and sensibly settled in other jurisdictions." *Bank of Am. v. Musselman*, 222 F. Supp. 2d 792, 796-797 (E.D. Va. 2002).

No legitimate criteria counseled against certification. As the district court recognized, courts construing similar statutes are divided, JA108-109, so this is decidedly not a case with a "clear state of the law in every other jurisdiction that has addressed the issue," *Powell v. United States Fid. & Guaranty Co.*, 88 F.3d 271, 273 (4th Cir. 1996) (affirming denial of certification). And there is equally no question that Maryland certification procedures were available when the Homebuyers moved to certify. *Compare National Capital Naturists, Inc. v. Board of Supervisors of Accomack Cnty.*, 878 F.2d 128, 132-133 (4th Cir. 1989) (no abuse of discretion to deny certification when state certification procedures not available). Even under the applicable abuse of discretion standard, *id.* at 132, the district court's rationale for denying certification—that it would "cause delay and possibly waste resources," JA159—does not pass muster.

In concluding that certification was not worth any further delay, the district court failed to weigh the countervailing interests. In particular, the district court too lightly dismissed *Johnson v. Collins Entm't Co., Inc.,* 199 F.3d 710, 715 (4th Cir. 1999). This case was cited by the Homebuyers for the proposition that federal

district courts should not usurp the authority of state courts to definitively interpret their own law.  Pls' Mot. Certify Question of State Law, ECF No. 449, at 3.  The district court distinguished this authority as irrelevant because it was "premised on the abstention doctrine, not Maryland's certification procedure."  JA160.  But in doing so, the court failed to recognize that certification serves the same goals as abstention, helping to "build a cooperative judicial federalism."  *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).  Certification, like abstention, provides "a means of getting authoritative answers to state law questions," so as to avoid a federal court "forecast" on the meaning of a state statute that is best construed by the state's highest court, which has the ability to conclusively resolve the question. 17A Charles Alan Wright et al., Federal Practice & Procedure § 4248 (3d ed. 2012).

Even if the district court did not abuse its discretion, this Court may still certify the question itself.  It has frequently certified novel and unresolved questions of state law to the Maryland Court of Appeals, even when no motion to certify was made before the district court.  *See, e.g.*, *United Pac. Ins. Co. v. East*, 250 F.3d 234, 236 (4th Cir. 2001) (certifying when "unaware of any controlling decisions of the Maryland state courts on these determinative questions"); *Welsh v. Gerber Prods. Inc.*, 839 F.2d 1035, 1036 (4th Cir. 1988) (certification plainly warranted because "the dispositive issue in this appeal presents a question of

Maryland law which appears to be unsettled"). Indeed, this Court has certified questions under Maryland's certification procedure even where, as here, the district court had already ruled on the questions, denied certification, and dismissed the case. *See Doe v. Pharmacia & Upjohn, Inc.*, No. 03-2166, 2005 WL 273143 at *4-5 (4th Cir. Feb. 4, 2005). The possibility of delay alone is insufficient to block certification when the risk of not certifying is wrongly resolving a novel and unsettled question of state law.

Certification may be particularly appropriate here, because the district court's cramped interpretation of § 19-501 stands in significant tension with the stated position of the Maryland Court of Appeals that where "there is tortious injury, there should be recovery, and only strong arguments of public policy should justify a judicially created immunity for tortfeasors and bar to recovery for injured victims." *Boblitz v. Boblitz*, 462 A.2d 506, 515 (Md. 1983). Especially for licensed holders of public trust, such as security guard agencies, public policy arguments strongly counsel in favor of expanding liability, not conferring immunity, as "a security company is best positioned to examine the background of employees and exclude any who display a propensity to commit tortious acts." JA110. The district court nonetheless opted to let stand its forced rewrite of Maryland's statute, offending public policy and denying Maryland courts the opportunity to definitively interpret their own law. If this Court is not prepared to

reverse the district court's aggressive rewriting of the statute, it should at least certify the question of liability under § 19-501 to the Maryland Court of Appeals.

## III. THE HOMEBUYERS' NEGLIGENCE CLAIMS SHOULD HAVE GONE TO TRIAL

Lastly, the district court erred by denying the jury the right to decide whether the Homebuyers' undisputed injuries were caused by SSA's negligence. Tellingly, the district court never concluded that SSA had no duty to prevent harm to others, through proper hiring, training, and supervising of its security guards, or through exercising reasonable care in providing security services. Nor was the sufficiency of evidence regarding SSA's breach ever seriously disputed. Equally undisputed was the serious harm suffered by the homebuyers. But through a series of technical contortions, the district court nonetheless granted summary judgment to SSA on the Homebuyers' negligence claims.

To the extent the court's reasoning can be discerned, it appears to have concluded that any duty SSA had to prevent harm did not run to the Homebuyers, JA172-173. Because the Homebuyers had no property damages claims, and because, according to the district court, SSA itself (as opposed to its employees) "committed no fraud or malice," the court was unwilling to allow the Homebuyers' negligence claims to go to the jury, JA173. The district court accorded no legal weight to the Homebuyers' clear emotional connection to their homes, their regular

presence in the neighborhood, and to the fact that they were specifically targeted by Speed and his cronies.

The district court improperly borrowed from inapposite tort doctrines, failed to recognize that the Homebuyers' injuries, as alleged, *were* the direct result of intentional conduct targeted at them, not their houses, and appears to have erroneously incorporated restrictions from actions against property into the Homebuyers' bread-and-butter negligence claims for personal injury. The district court engaged in no analysis of SSA's duty as an employer to protect the public from foreseeable harm caused by its own employees as a result of its own negligent hiring. Most gravely, the court improperly usurped the jury's role in unilaterally concluding that the Homebuyers' injuries could never have been the foreseeable result of SSA's undisputed breach of its undeniable duty to prevent exactly what occurred.

## A.  SSA Owed A Duty of Reasonable Care To Protect The Homebuyers From Harm

**1.**  As an employer, particularly an employer of security guards who are uniquely positioned to do harm given their unfettered access to private areas that it is charged with protecting, SSA had a duty to exercise reasonable care in hiring and supervising its employees. The sole relevant issue governing SSA's duty, as an employer, is whether SSA "use[d] reasonable care to select employees competent and fit for the work assigned to them and *** *refrain[ed] from retaining*

*the services of an unfit employee.*"  *Henley v. Prince George's Cnty.*, 503 A.2d 1333, 1136, 1341 (Md. 1986). (emphasis added).  It defies logic to, as the district court did, sustain a claim against SSA's employee Speed for intentional torts (and use the intentionality of Speed's conduct to absolve SSA from vicarious liability), yet dismiss out of hand a negligent hiring claim against SSA without *any* examination as to whether SSA knew or should have known that Speed was capable of such intentional and malicious actions.

That SSA owed no formal contractual duty to the Homebuyers is irrelevant. Maryland courts impose on every employer a duty "to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee.  The class of persons intended to be protected by the imposition of this duty necessarily includes those members of the public who would reasonably be expected to come into contact with [the employee] in his performance of security duties."  *Henley*, 503 A.2d at 1341.

Self-anointed "keepers of the trust," JA938, that market their services in order to protect others against the pervasive dishonesty in society, *id.*, and purport to carefully screen their employees before hiring, should surely be held accountable for the recognized risks attendant to bad hiring decisions.  Indeed, SSA recognized that its guards' privileged status as the "keepers of that trust," meant that their credentials "must be beyond question."  *Id.*  SSA expected its

guards to "protect the lives and property of the client and his or her employees." JA944. SSA's promotional materials even promised CPR training to its guards as first responders, evidencing SSA's own recognition of a higher duty of care towards the public than that of the average employer. *See* JA433.

This duty to protect clearly extended to the Homebuyers, all of whom made regular visits to the Hunters Brooke site to see the progress on their homes. *See* JA418 at 84:02-08 (visited almost every day); JA421 at 84:15-85:05 (every weekend); JA410 at 125:03-09 (same): JA423 at 114:14-18 (same).

Many of the Homebuyers frequently visited at night during the time SSA was supposed to provide security, and during their visits, interacted with Speed and Fitzpatrick. Jacque Hightower says he was stopped more than five times by Aaron Speed when he and his family went to visit his home. JA971 at 135:8-136:7. Dawn Hightower recalls seeing Speed six to eight times and found it odd that he continued to stop them, given that the couple had visited their house and talked with Speed so many times. JA981-982 at 97:22-100:11. Michael Clark recalls a security guard stopping him and telling him he could not go back to his home. JA977 at 30:5-20. Leonard Swoopes recalls a security officer stopping him and his wife during one of their visits to their home to ask him the lot number of his home. JA984 at 78:4-81:3.

Under Maryland law, these extensive contacts, buttressed by SSA's own promises of protection, sufficed to establish SSA's general duty to prevent harm to the Homebuyers, particularly given its notice of Speed's propensity to harm others. *Henley*, 503 A.2d at 1341-1342. By any account, SSA breached its duty of care in hiring (and rehiring) Speed, failing entirely "ascertain[] the fitness of [Speed] for a position that not only brought him in contact with the [Homebuyers] but also gave him access to their homes." *Cramer v. Housing Opps. Comm'n of Montgomery Cnty.*, 501 A.2d 35, 38 (Md. 1985).

**2**. The record shows that SSA knew, or should have known, that Speed had a propensity to harm others:

> In hiring its employees, SSA's marketing materials suggest that it performs a "thorough examination of the applicant's background, including verifications of prior employment, education, and personal references." Speed's personnel file contains no such verifications and SSA had not suggested that it performed any. Had SSA spoken with Speed's personal references, it would have learned that Speed had recently been in an outpatient mental health clinic. Additionally, it may have learned that Speed had been expelled from high school for an act of violence against a classmate. After being hired, Speed had problems at work and in August 2004, got in an altercation with his supervisor and quit. SSA placed a note in Speed's file stating "not for rehire" after this incident. However, needing employees in November 2004, SSA rehired Speed and assigned him to Hunters Brooke.

JA168 (internal citations deleted).

The district court erred by refusing to let the jury consider the Homebuyer's claims in light of this evidence that SSA knew, or should have known, that Speed was unstable and had a propensity to harm others.  This notice established SSA's clear duty, under Maryland law, to protect the Homebuyers from harm.

**3.**  That SSA itself may have "committed no fraud or malice," JA173, is irrelevant to the duty inquiry.  Maryland courts have long held that employers can be directly liable under a negligent hiring, training, and supervision claim for an employee's intentional torts, including intentional infliction of emotional distress. *See Williams v. Cloverland Farms Dairy, Inc*., 78 F. Supp. 2d 479 (D. Md. 1999). In *Williams*, an African-American customer suffered emotional harm from an employee's derogatory racial comments and the complaint alleged separate counts of intentional infliction of emotional distress (as to the employee) and negligent hiring, training, and supervision (as to the employer).  *Id.* at 482-484.  The court sustained the claim of negligent hiring and training, because, as here, the plaintiff could show that "her injury was caused by the tortious conduct of an employee, the employer knew or should have known that the employee was capable of inflicting harm of some type, the employer failed to use proper care in hiring or training the employee, and the employer's breach was the proximate cause of the plaintiff's injury." *Id.* at 484.

In *Henley*, similarly, when a carpenter performing guard duties viciously murdered a 15 year-old vandal on the property, and the evidence supported the conclusion that the murder was the foreseeable result of the employer's failure to take seriously the employee's previous indications of his propensity to do harm, the court denied summary judgment on a claim of negligent hiring. *Henley*, 503 A.2d at 1342. So too here. Summary judgment was improper because SSA knew or should have known that placing Speed in that position of trust presented a risk of harm to members of the public. *Accord Cramer*, 501 A.2d 35 (failure to perform adequate background check exposed employer to damages for negligent hiring claim when employee home inspector, granted privileged access by nature of his job, raped tenant).

**4.** The district court likewise erred in dismissing the Homebuyers' direct negligence claim. SSA's duty, by its own admission, was to protect the neighborhood and prevent criminal acts by "unauthorized personnel" like Speed's co-conspirators. *See, e.g.*, JA426.[8]

---

[8] *See Hemmings v. Pelham Wood LLP*, 826 A.2d 443, 457 (Md. 2003) ("A landlord has a legal duty to take reasonable security measures within the common areas when" notice of past criminal activity creates knowledge of foreseeable harm); *Scott v. Watson*, 359 A.2d 548 (Md. 1976) (notice of criminal activity

The execution of the arson falls under the classification of a "crime of opportunity" and is the very type of crime that the mere presence of a security guard is supposed to prevent. JA554-555; JA596 ¶¶ 95-98. SSA had been hired to protect the neighborhood, as Hunters Brooke was "off the beaten path," and "in a very dark area." JA398. The foreseeable result of leaving Hunters Brooke unguarded, is that criminals would enter and crimes would be committed. As the district court initially recognized, even under the most rigid *respondeat superior* principles, there was sufficient evidence to go to the jury on the question of SSA's vicarious liability resulting from Fitzpatrick's negligence in leaving his post, and giving Speed and his co-conspirators unfettered access to the neighborhood and freedom to commit the arson. JA114-116. The district court also recognized that there was sufficient evidence to go to the jury on the claim that SSA had ratified Fitzpatrick's negligent conduct. JA158. Neither the Homebuyers' lack of formal

---

creates duty to prevent criminal acts against tenants). Other jurisdictions have explicitly held that failures by security guards that allow criminal acts can impute liability to the security company. *See Cruz v. Madison Detective Bureau, Inc.,* 137 A.D.2d 86 (N.Y. App. Div., 1988) (sustaining action where security company failed to follow its own procedures and movie patrons attacked usher when guard was supposed to be present).

title to their property, nor the type of harm alleged, should have prevented the jury from hearing their claims.[9]

5.  Underpinning the district court's flawed analysis was a threshold misstep that standard negligence tenets of the duty to prevent foreseeable harm were inapposite, "because Plaintiffs did not own the Hunters Brooke properties at the time of the arson."  JA172.  No authority supports this bald assertion.  In its briefing below, SSA relied on *Gates v. Sprint Spectrum, L.P.*, 523 F. Supp. 2d 1287 (D. Kan. 2007) to argue that the Homebuyers "lacked standing to bring a negligence claim for property damage."  Def. Mot. Summ. J., ECF No. 315, at 31. But *Gates* is a district court case from Kansas applying Texas law to a trespass action, *not* a personal injury claim.  Neither *Gates*, nor any other authority relied upon by SSA below, supports the district court's bald conclusion that, despite the showing made below concerning the emotional, temporal, and financial investments made by the Homebuyers, they could not bring before the jury their

---

[9] The court's reliance on *Hamilton v. Ford Motor Credit Company*, 502 A.2d 1057 (Md. Ct. Spec. App., 1986), for the proposition that "[c]urrently, Maryland law does not entertain a tort for negligent infliction of emotional distress," JA172, is misplaced.  The Homebuyers have not brought a claim for negligent infliction of emotional distress.  They alleged simply that SSA's negligence permitted the intentional misconduct that caused their severe emotional injuries.  JA133.

claims of personal injury – *e.g.*, that they suffered severe emotional harm as a result of being targeted by a malicious act, simply because they did not hold formal property title.[10]

The district court failed to apply the correct legal test to the Homebuyers' allegations, that *they* (not their homes) were the direct target of the tortious conduct, as the arsonists (including Speed) acted with racial animus against the Homebuyers themselves, and conspired to undertake the arson "with the intent to prevent African-American families from moving into the neighborhood." JA059-060 at ¶ 1; JA092.

To the extent it was making a determination of legal duty, the district court thus clearly erred when it granted summary judgment on the grounds that "it would not be foreseeable to SSA that its negligent acts would expose it to liability for the emotional harm of Plaintiffs who were neither in the zone of danger at the time of

---

[10] The district court recognized there was "no question that Plaintiffs were emotionally invested in the properties at Hunters Brooke, visiting the properties and participating in their design," yet concluded that their legal claims were without basis because they were "founded on emotional harm flowing from economic damages, rather than property damage." JA172-173. This misses the point. The Homebuyers' emotional injuries flowed, as alleged in the Complaint, and supported by evidence which the jury was entitled to hear, from their understandable fear and anxiety of being racially targeted by violent acts intended to keep them from moving into the neighborhood.

the arson nor suffered property damages as the result of the arson." JA173.  Under

Maryland law, SSA owed a general duty to prevent harm to the Homebuyers, given

SSA's duty to protect the people and property in Hunters Brooke, the Homebuyers'

extensive contacts with SSA's guards, and, especially, SSA's knowledge of

Speed's propensity to do harm.

### B.    Foreseeability Was The Jury's To Decide

If the district court's grant of summary judgment turned instead on its

conclusion the Homebuyers' injuries were not the foreseeable result of SSA's

negligence, then it improperly usurped the jury's role. *See Farley v. Yerman*, 190

A.2d 773, 775-776 (Md. 1963).  Stated simply, the district court erred in conflating

SSA's established duty to protect the Homebuyers from harm with the legally

distinct question of whether the precise sequence of events resulting in the

Homebuyers' undisputed injuries was foreseeable.[11]

---

[11] "A specific fact situation can be analyzed in terms of a duty, or if a duty is assumed or held to exist, in terms of proximate cause."  *Yonce v. Smithkline Beecham Clinical Labs., Inc.*, 680 A.2d 569, 575 (Md. Ct. Spec. Appl. 1996).  *See also Henley*, 503 A.2d at 1340 (citing Prosser and Keeton on The Law of Torts § 53 (W. Page Keeton et al. eds., 5th ed. 1984) for the proposition that "the limitation of causation by the use of the modifier 'proximate' and the limitation of duty by the requirement of foreseeability are fundamentally similar.")

Under Maryland law, for negligent behavior to result in foreseeable harm, "the manner in which the risk culminates in harm may be unusual, improbable and highly unexpectable, from the point of view of the actor at the time of his conduct. And yet, if the harm suffered falls within the general danger area, there may be liability." *Foor v. Juvenile Servs. Admin.*, 552 A.2d 947, 955 (Md. Ct. Spec. App. 1989) (quotations and internal citations omitted). Thus, the question is whether SSA "should have foreseen the general harm," namely, possible injury to the Homebuyers who had extensive contacts with its guards, and "not the specific manifestation of that harm," *e.g.*, the arson that targeted them and the severe emotional injuries incurred as a result. *Yonce*, 680 A.2d at 578.

Here, SSA may not have been able to predict the precise details of how its negligence would culminate in allowing Speed to conspire with others to intentionally terrify the Homebuyers (with the aid of Fitzpatrick's early departure). But SSA's duty to exercise reasonable care so as to avoid the general danger of harm to those, like the Homebuyers, "who would reasonably be expected to come into contact with [an employee] in his performance of security duties," *Henley*, 503 A.2d at 1341, is foundational under Maryland law. Given this established duty to prevent harm to those reasonably expected to encounter SSA's guards, particularly in light of SSA's notice of Speed's propensity to do harm, the district court erred in dismissing the case on lack of foreseeability grounds. *Foor*, 552

A.2d at 956. *See also Cramer*, 501 A.2d at 43 (jury should determine the causal relationship between negligent hiring of a home inspector and subsequent assault).

At bottom, the concept of foreseeability is "simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where, *** it appears highly extraordinary that the negligent conduct should have brought about the harm." *Henley*, 503 A.2d at 1340. Where, as here, duty is clear, the jury should make this call. *See, e.g., Sacks v. Pleasant*, 251 A.2d 858, 862 (Md. 1969); *Chesapeake & O. Ry. Co. v. Coffey*, 37 F.2d 320, 324 (4th Cir. 1930).

## CONCLUSION

For the foregoing reasons, appellants respectfully request that this Court reverse the district court's grant of summary judgment with respect to the Maryland Security Guards Act and the negligence-based counts and remand for further proceedings. If this Court is reluctant to interpret § 19-501 in the first instance, appellants respectfully request that the question of whether the Maryland Security Guard Act's broad formulation imposes liability on licensed security guard agencies beyond the narrow bounds recognized under traditional vicarious liability principles be certified to the Maryland Court of Appeals.

Dated: April 2, 2013                    Respectfully submitted,


                                        /s/ Ruthanne M. Deutsch
                                      _____

Isabelle M. Thabault                   Ruthanne M. Deutsch
Megan Whyte                              *Counsel of Record*
WASHINGTON LAWYERS COMMITTEE FOR       Steven H. Schulman
CIVIL RIGHTS AND URBAN AFFAIRS         Joseph L. Decker
11 Dupont Circle, NW                   Maka Y. Hutson
Suite 400                              AKIN GUMP STRAUSS HAUER &
Washington, D.C. 20036                 FELD LLP
(202) 319-1000 (telephone)             1333 New Hampshire Ave., N.W.
(202) 319-1010 (fax)                   Washington, D.C. 20036
                                       (202) 887-4000 (telephone)
                                       (202) 887-4288 (fax)
                                       rmdeutsch@akingump.com

                  *Counsel for Plaintiffs-Appellants*

69

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C), I certify that the foregoing corrected brief complies with the type-volume limitation prescribed by this Court's rules. The corrected brief contains 13,874 words in Times New Roman font, 14-point size.

/s/ Ruthanne M. Deutsch
Ruthanne M. Deutsch
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
(202) 887-4000 (phone)
(202) 887-4288 (fax)
rmdeutsch@akingump.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2013, I electronically filed the foregoing **Appellant's Corrected Opening Brief** with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. The following participants in the case who are registered CM/ECF users will be served by the CM/ECF system:

Gary Alvin Bryant
Jerome David Crain, Jr.
WILLCOX & SAVAGE, PC
Wells Fargo Center
Suite 2200
400 Monticello Avenue
Norfolk, VA 23510
(757) 628-5520
gbryant@wilsav.com

Gerry Hoban Tostanoski
TYDINGS & ROSENBERG, LLP
26th Floor
100 East Pratt Street
Baltimore, MD 21202
(410) 752-9733
gtostanoski@tydingslaw.com

/s/ Ruthanne M. Deutsch
Ruthanne M. Deutsch
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave., NW
Washington, DC 20036
(202) 887-4000 (phone)
(202) 887-4288 (fax)
rmdeutsch@akingump.com

71